IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-CV-02147-KAS

ANGEL EHRLICH,
MADELIENE POWERS,
JENNIFER MCDONALD,
HANNAH MILLER,
MYRIAH MONTOYA,
SHELANDRA BATTLE,

      Plaintiffs,

v.

ROCKY MOUNTAIN CRISIS PARTNERS f/d/b/a METRO CRISIS SERVICES, Inc.;
BEVERLY MARQUEZ;
YOLANDA HOWE; and
HELEN LITTRELL

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

This is a civil rights action seeking damages for sexual and racial hostile work environment, retaliation, and common law torts by Plaintiffs Angel Ehrlich, Madeline Powers, Jennifer McDonald, Hannah Miller, Myriah Montoya, and Shelandra Battle against their former employer, Rocky Mountain Crisis Partners ("RMCP") f/d/b/a Metro Crisis Services and its officers. Plaintiffs worked as Behavioral Crisis Specialists on Defendant RMCP's suicide-prevention crisis hotline. RMCP failed to train and prepare Plaintiffs to handle callers who used the line for purposes other than for suicide prevention, and who instead used the line for sexual gratification and racial harassment. As a result, Plaintiffs suffered from ubiquitous degrading and

1

odious conduct including chronic use of the N-word, callers masturbating on them and living out their sexual fantasies on them, invasive inquiries into their intimate lives, and other graphic and disturbing racially and sexually offensive epithets, comments, and stories.

RMCP utterly failed to implement appropriate and commensurate policies, procedures, or practices to permit its employees to escape such harassment. Instead, RMCP forced its employees to remain on calls with abusive callers for extended periods of time and punished employees for attempting to share accurate information about callers or hanging up the line on abusive callers. As a result, Plaintiffs suffered significant and severe emotional distress on a daily basis. After Plaintiffs and their coworkers raised numerous complaints to supervisory staff, RMCP management failed to take appropriate action to mitigate or remedy the abuse, and instead actively sought to suppress communications about the abuse for business purposes. RMCP fired at least eight of the most vocal seventeen employees who participated in discussions about the sexual and racial harassment, including Plaintiffs, who discussed the abuse and management's inaction with each other on an internal text chain. Plaintiffs now seek justice for the abuse they suffered and their wrongful terminations following their legitimate and legally protected attempts to seek aid and support for the abusive conduct that their employer would not act to ameliorate.

## JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States and Colorado common law.

2.      This action for damages results from sex and race-based discrimination and retaliation and is commenced pursuant to the federal Title VII of the Civil Rights Act of 1964, 42

U.S.C. 2000(e) et. seq. ("Title VII") and 42 U.S.C. § 1981 (Section 1981). Further damages are sought pursuant to C.R.S. §13-21-102.5.

3.       Jurisdiction is proper pursuant to 28 U.S.C. § 1331 for the federal law claims and pursuant to § 1367 for pendant state law claims.

4.       Venue is proper in the District of Colorado, because the incidents and resulting injuries giving rise to this action were caused by Defendant employer RMCP, located in Denver, Colorado.

5.       Defendants Beverly Marquez, Yolanda Howe, and Helen Littrell are also residents of, and domiciled in, Colorado.

6.       Plaintiffs have exhausted all necessary administrative remedies. Each Plaintiff has timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission (EEOC) and/or the Colorado Civil Rights Division (CCRD).

## PARTIES

7.       Plaintiff Angel Ehrlich is a citizen of the United States and has been at all times relevant herein a resident of Colorado and/or Florida. At all times relevant to this complaint, Ms. Ehrlich was a remote employee of RMCP.

8.       Plaintiff Madeline Powers is a citizen of the United States and has been at all times relevant herein a resident of Texas. At all times relevant to this complaint, Ms. Ehrlich was a remote employee of RMCP.

9.       Plaintiff Jennifer McDonald is a citizen of the United States and has been at all times relevant herein a resident of Texas. At all times relevant to this complaint, Ms. Ehrlich was a remote employee of RMCP.

10. Plaintiff Hannah Miller is a citizen of the United States and has been at all times relevant herein a resident of North Carolina. At all times relevant to this complaint, Ms. Ehrlich was a remote employee of RMCP.

11. Plaintiff Myriah Montoya is a citizen of the United States and has been at all times relevant herein a resident of Colorado. At all times relevant to this complaint, Ms. Ehrlich was a remote employee of RMCP.

12. Plaintiff Shelandra Battle is a citizen of the United States and has been at all times relevant herein a resident of Florida. At all times relevant to this complaint, Ms. Ehrlich was a remote employee of RMCP.

13. Defendant Rocky Mountain Crisis Partners f/d/b/a Metro Crisis Services, Inc., is a corporation established under the laws of Colorado, with a principal street address at 1355 S Colorado Blvd, C900, Denver, CO 80222 and a principal mailing address of P.O. Box 460695, Denver, CO 80246.

14. Defendant Beverly Marquez is a citizen of the United States and has been at all times relevant herein a resident of Colorado. At all relevant times to this Complaint, Ms. Marquez was the President and Chief Executive Officer, as well as the registered agent for Defendant Rocky Mountain Crisis Partners.

15. Defendant Yolanda Howe is a citizen of the United States and has been at all times relevant herein a resident of Colorado. At all relevant times to this Complaint, Ms. Howe was the Vice President of Human Resources for Defendant Rocky Mountain Crisis Partners.

16.     Defendant Helen Littrell is a citizen of the United States and has been at all times relevant herein a resident of Colorado. At all relevant times to this Complaint, Ms. Littrell was the Education Committee Chair for Defendant Rocky Mountain Crisis Partners.

## FACTUAL ALLEGATIONS

17.     Defendant Rocky Mountain Crisis Partners is a corporation established under the laws of Colorado. RMCP operated pursuant to a contract with the state of Colorado to provide suicide prevention and/or mental health call center support services for Colorado's 988 call hotline.

18.     RMCP employed each of the above-named Plaintiffs as Behavioral Crisis Specialists ("Crisis Specialists").

19.     Plaintiffs each began their employment with RMCP as Crisis Specialists on June 5, 2023.

20.     Plaintiffs were introduced to each other through RMCP in a common class of incoming Crisis Specialists and trained together with that class of students to take mental health calls remotely through RMCP's crisis hotline.

21.     As Crisis Specialists, each of the Plaintiffs were responsible for rapidly evaluating complex behavioral health situations and to then develop, recommend, and support appropriate telephonic crisis interventions implemented with individual callers, their families, and a wide variety of community collaborators, including healthcare professionals, law enforcement, and EMS personnel.

22.     Plaintiffs received incoming calls, provided assessment of situations and behaviors as presented (including suicide ideation, substance use and homicidal ideation), and

provided appropriate support and crisis intervention and de-escalation telephonically.

23.     Importantly, Plaintiffs also became accustomed to evaluating whether callers were truly suicidal or calling for other, inappropriate, reasons.

24.     Not long after each of the Plaintiffs began taking calls for RMCP as Crisis Specialists, each began to notice a subset of common callers who sought to exploit the suicide hotline for sexual gratification and/or racist abuse.

25.     Often referred to as "sex grat callers," such persons would call and seek out a female voice with whom they would attempt to engage in implicitly or explicitly sexualized conversations in order to achieve sexual satisfaction.

26.     The calls involved attempts at simulated roleplay; requests to use certain sexualized language, tone, voice, or other responses that caller sought for arousal; and graphic depictions of fantasy scenes that the caller recounted, described, or imagined living or reliving.

27.     The calls often involved descriptions of clothing, acts, nudity, and situations that the callers found arousing.

28.     These sex grat calls were often accompanied by sounds commonly associated with masturbation, including heavy breathing, moaning, physical repetition, and/or other sounds indicative of arousal and ejaculation.

29.     Some callers would also routinely use other racially and sexually abusive language.

30.     Callers used degrading and sexist epithets and sexual innuendos when talking to Plaintiffs and their coworkers, including inter alia:

    a.  One caller referred to Ms. Powers as "dog shit" and a "bitch."

   b.   Another caller described to Ms. Ehrlich that he still had blood on his dick from raping someone and called then called her a "Nazi whore."

   c.   Another caller asked Ms. Ehrlich about the size of her six-year-old son's genitals.

   d.   Another caller left Ms. Ehrlich the false last name of "Morehead" every time he called.

   e.   Yet another caller asked Ms. Ehrlich frequently if she could "keep secrets."

31.    Callers subjected Plaintiffs and others to a constant stream of objectively offensive racist invectives, including *inter alia*:

   a.   A caller screamed at Ms. Miller that she was a "fucking nigger" and "nigger bitch."

   b.   Another caller labelled Ms. McDonald a "nigger" and asked her to perform acts of sexual gratification to him.

   c.   Another caller, one who called often, expressed to Ms. Miller that he wished she would be "raped" and "die" while calling her a "nigger bitch."

32.    Callers made Plaintiffs suffer through descriptions of sexually perverse fantasies and stories, including *inter alia*:

   a.   One caller, discussed with Ms. Powers that his favorite piece of girl's clothing to wear was a bra.

   b.   Another caller told Ms. Powers that she reminded him of his aunt. He then asked Ms. Powers to speak to him in a soft tone and read bible scriptures to him. The caller then explained to Ms. Powers that his aunt was a pastor and had molested him as little boy, informing Ms. Powers that her voice brought him sexual sensations.

   c.   One caller told Ms. Ehrlich that he had inserted a "toy" into his anus and was waiting for the hotel maid to walk in on him.

   d.   One frequent allegedly transgender caller spoke with many of the Plaintiffs, including Mses. Montoya and Battle. She described dressing up in little girl's panties and fantasizing. She described dreaming of how little girls looked in panties and how she knew she was a woman.

e.  One caller spoke with Mses. Ehrlich, McDonald, Powers, and Battle in whispers and shared intimate sexual stories, for example, he called and described how he had mistakenly been accused of masturbating in public because of his breathing and moaning, and then asked her not to record the call even though he knew all calls to the hotline were recorded.

f.  Another caller told the Ms. Ehrlich that his girlfriend's daughter climbed into bed with him, slid under the covers and gave him blow jobs while he was sleeping. The daughter was only fourteen years old.

g.  One caller told Ms. Ehrlich that he raped his own daughter, a

h.  Another caller described to Ms. Ehrlich that raping child is what kids deserve.

i.  A frequent caller described to Ms. Montoya his continuous rape from when he was a little boy to the present. He became enraged and would scream loudly at Ms. Montoya, describing how he was allegedly sodomized and left bleeding all day, every  single day since he was a little boy. He asked Ms. Montoya, "do you know what it feels like to have your tight little asshole ripped open by his fat cock?" or "can you imagine how much blood is spilling out of my tight little ass because of how huge and hard his dick was?" He insisted that Ms. Montoya answer these questions yes or no and threatened that if she did not, he would call for her supervisor.

33.  Callers sexually imposed on Plaintiffs by simulating sex and even masturbated while speaking with them:

a.  A caller described the size of his penis to Ms. Powers and proceeded to masturbate and moan over the phone.

b.  A caller similarly stated to Ms. Ehrlich that he was stressed and said multiple times that there's only one thing that helps, which was his penis being thick.

c.  A repeat caller liked to tell Ms. Ehrlich that he was "jamming it out and long and hard" to describe himself masturbating and told her that "I just need a release." He tried to guide Ms. Ehrlich into repeating those same phrases back to him during his conversations with her.

d.  Another frequent caller told stories to Mses. Montoya and Powers about how his girlfriend dominated him in karate and how his girlfriend was "fucking her instructor and making him watch." He described how he watched his girlfriend have "rough sex" with her instructor while shouting at the caller to embarrass him

and question his power in their relationship. During one of these calls, Ms. Powers discovered he was touching himself.

e.   Another caller kept repeating to Ms. Powers that he liked to "pet his cat" referring to his penis. When he said this, Ms. Powers heard him moaning and yelling repeatedly "Don't hang up!" while masturbating.

f.   Another frequent caller told Ms. Miller to keep a secret about a time a woman caught him masturbating in the bathroom and then asked Ms. Miller how she had felt hearing this story. While the caller told her the story, Ms. Miller could hear him breathing heavily and noises in the background.

g.   A caller described to Ms. Ehrlich how he was stroking his penis while talking to her to relieve stress.

h.   One frequent caller called Ms. Battle at least a half dozen times to relive an alleged sexual assault that happened. The caller asked Ms. Battle to tell her repeatedly "Don't Stop, keep going," to which the caller would respond "But it hurts, it really hurts." After that, she demanded Ms. Battle to say, "I know it hurts, but don't stop." The caller then howled out "Ow! Ow! Ow! Ow!" until she climaxed and released.

i.   After one caller was asked by Ms. Ehrlich how he clears his head, he asked her, "What about head?" As she was trained to do, Ms. Ehrlich initiated deep breathing exercises to help him emotionally regulate. He continued to talk throughout the breathing exercise then bust out in a string of expressive expletives, "Shit, fuck!" while ejaculating before hanging up the phone.

j.   Another caller masturbated over the phone on Ms. Battle while watching a pornographic movie in the background.

k.   A caller told Ms. Ehrlich he was having a difficult time sleeping and wanted Ms. Ehrlich to help him with "these 8 inches," and that "I'll get some sleep after I'm finished."

34. Another caller made Ms. Montoya moan on the phone in response to everything the caller said, asking Ms. Montoya to repeat the caller's name and phrases like "Please don't stop," and "please keep going" after each time the caller moaned and made orgasmic noises.

35. Such calls occurred frequently, often initiated by repeat callers, and oftentimes taking place multiple times a week.

36. The RMCP workplace was saturated with dirty, sexual, racist remarks and comments, stories, and simulations, which not only Plaintiffs but their fellow Crisis Specialists suffered from.

37. Other examples include a caller telling one Crisis Specialist that work caused him stress and only stroking his penis helped relieve it; another caller described to a Crisis Specialist "his 8 inches" while masturbating and complaining that he needed sexual release because it was the only thing that helped him; and another caller shared with a Crisis Specialist the same story about his girlfriend's fourteen-year old daughter climbing into bed and giving him a blow job, resulting in that Crisis Specialist calling social services. The list of offensive calls is extensive.

38. RMCP had an internal documenting system, which documented a number of the calls, and which will provide an extensive record of abuse.

39. However, RMCP did not allow all abusive calls to be documented in the internal system. RMCP permitted calls to be documented in the system only if a Crisis Specialist confronted the caller and got an admission that they were masturbating, or manager concluded that the caller was masturbating – after listening to caller while they went through their machinations.

40. This practice not only required RMCP Crisis Specialists to awkwardly confront suspected sex grat callers, but also resulted in underreporting in the RMCP system of such abuses.

41. These persistent calls greatly impacted Plaintiffs' mental wellbeing and close relationships. They had trouble concentrating, returning to new callers after traumatic phone calls, and focusing on the work they were hired to provide – to genuinely help those in mental distress.

42. One day, for example, after a particularly offensive sexual gratification call, Ms.

Powers acknowledged,

> "I texted my boyfriend and told him that I got a grat call and that I felt like I was being sexually abused and like I cheated on him??? Like obviously it's not my faut that it happened and he was trying to calm me down after the call, but its so gross I couldn't deal."

43.     Notwithstanding the traumatic impact the calls had on Plaintiffs and their colleagues, RMCP showed no empathy for their employees.

44.     As a matter of practice, RMCP supervisors would not permit Crisis Specialists to autonomously disconnect from abusive calls. Supervisors repeatedly told Crisis Specialists that they must go through an obstinate procedure if they wanted to get off of a call that involved several steps:

   a. Crisis Specialists were expected to "respond with a calm voice, language and take caution not to communicate frustration, judgement, anger or irritation."

   b. Crisis Specialists were expected to repeatedly "set boundaries" when callers strayed into abusive topics, areas, and conversations, to identify and appoint callers back to acceptable or "authorized" lines of conversation.

   c. Crisis Specialists then would have to make active and affirmative efforts to "redirect the caller" to cognizable mental health issues that could be addressed.

   d. If the caller persisted with abuse, Crisis Specialists would have to alert a supervisor to listen in on the conversation. Then, and only then, were Crisis Specialists permitted to approve a disconnect – if the supervisor agreed it was abusive and permitted the disconnect.

45.     The process for disengaging from an abusive caller was unrealistically time-consuming, onerous, and remained contingent on the subjective decision of management, rather than the analysis of the Crisis Specialist facing the abuse.

46.     Practically speaking, the process of disconnecting from an abusive caller was so slow and onerous as to result in obsolescence.

47.     Plaintiffs reported waiting anywhere from five or ten minutes to upwards of half an hour for a lead to respond, listen, and allow them off the call – if such permission was ultimately bestowed at all. By the time Defendant's mandated "boundary setting" and "redirection" process took place, a supervisor was called, and permission obtained to disconnect, a vast majority of sexual and racially abusive callers had already satisfied their fantasies and nefarious objectives.

48.     Further adding to the problems associated with the process, leads retained the ultimate authority in excusing a Crisis Specialist from calls, often resulting in virtually no protection for Crisis Specialists. At times leads did not get on the line fast enough to hear particularly repugnant call, or they disagreed that certain sounds (i.e. moaning, pounding, vibrations, etc.) were actually sounds associated with masturbating.

49.     The process disempowered Crisis Specialists, made them feel hopeless, and repeatedly subjected them to repeated abuse as a captive audience.

50.      Sexually and racially abusive calls have historically been commonplace at crisis intervention hotlines like RMCP.

51.     The phenomenon is well known and highly foreseeable in the industry.

52.     The abusive conduct was commonplace at RMCP.

53.     In theory, RMCP implemented an EEO policy which proscribed sexual and other forms of harassment.

54.     However, on its face, the policy only attempted to *enforce* such codes of conduct on employees and interns – and not on callers. This was the practice of RMCP as well. It made no

effort to enforce the EEO policy against callers not withstanding language in the policy that implied that the policy applied to clients.

55.     The company EEO policies did not identify a method for employees to complain, or to obtain relief from abusive caller-conduct.

56.     Plaintiffs, and on information and belief – other RMCP employees, routinely complained about the prevalence of abusive calls and the inability to address them or protect themselves from the emotional toll it took, in group meetings, during supervisor contacts/chats, and in one-on-one reviews and counselling sessions.

57.     But management never provided any meaningful relief.

58.     Instead, Plaintiffs were met with particular callousness in response to their direct pleas for help and complains about trauma, for example:

    a.   During the week of July 6, 2023, Ms. Ehrlich described a caller's language as "abusive" in Spark, an internal data management and messaging system. Her supervisor, Jana Christensen, scolded her, blaming her for failing to use "caller centered" language.

    b.   Ms. Christensen also told Ms. Ehrlich that her description in Co-Connect ("COCO"), another internal data collection and communications system used by RMCP, of the caller as abusive "might prohibit a caller from getting the support." To illustrate her point, Ms. Christensen argued possible sexual gratification callers would be adversely affected as Crisis Specialists would hesitate to answer their calls. Then she reminded Ms. Ehrlich that their Teams Chat was a legal document that might get subpoenaed, and that RMCP did not want to "seem" as if it tarnishes callers.

    c.   Between July and August of 2023, Ms. Montoya received sexual gratification calls from a repeated and well-known caller who constantly narrated being raped as a child up through the present day. Ms. Montoya asked her supervisors, Susan Nelson and Kat P. for permission to end these calls. Rather than allowing her to do so, her supervisors instructed her to "redirect" the conversation to create a "safe space" for the caller, because "it was what he needed to heal and feel validated." They further told Ms. Montoya that she could not classify the call as a sexual gratification call because they did not believe the caller was sharing "fake

or made-up stories, nor was he masturbating or using the line to pleasure himself."

d. In mid-July 2023, Ms. Battle spoke again with the caller who explicitly detailed his sexual assault at the hands of his aunt. After about five minutes of Ms. Battle attempting to "redirect" the caller to focus on his emotions, Ms. Battle's Team Lead Alex Pastor finally wrote to her that she could disconnect. However, notwithstanding the numerous times Ms. Battle had previously reported similar conduct by this caller and the fact that Ms. Pastor had now personally witnessed it herself, Ms. Pastor did not update the chart to reflect that the caller should be funneled immediately to an appropriate lead or supervisor, instead suggesting it be funneled to a male Crisis Specialist, of which there were very few on the same shift as Ms. Battle. Thus, female Crisis Specialists continued to have to respond to his calls and listen to him seek sexual gratification.

e. On July 25, 2023, Ms. Ehrlich wrote a complaint to her supervisor outlining several incidents of sexual harassment and their impact on her and other. In the letter, Ms. Ehrlich stated, "I did not take this position to be sexually abused. I was vastly unprepared for the number of sex-grat calls that I have received. We had a whole month of training, and of that whole month, half a day was dedicated to 'challenging callers,' and of that half a day, a blib was dedicated to sexual gratification callers." Ms. Ehrlich further complained, "This feels like a really unsafe practice to continue to expose female call takers to the potential of being non-consensually engaged in a call of sexual nature. It shouldn't be the, "we all get one," "Oh, I had that guy, too, 'it happens,' mentality." Ms. Ehrlich received no response.

f. In another instance following a complaint, another of Ms. Ehrlich's leads critiqued the way she had responded to a sexual gratification call, characterizing it as unacceptable. She chastised Ms. Ehrlich, insisting that she should have invited the sexual gratification caller to call back before he disconnected.

59. Not only did Plaintiffs complain to their respective supervisors but so did their colleagues. They all received similarly dismissive and trite responses.

60. Management told Ms. Battle that she was prohibited from referring to possible sexual gratification calls in COCO and other mediums of communication because such language was "not caller centered."

61.     Supervisors repeatedly criticized complaints about abusive calls and callers as "not call centered."

62.     To further cope with her experiences as a Crisis Specialist, Ms. Ehrlich searched for and found a working paper by an expert, John Plonski, of Covenant House International, called *Working With Difficult Interactions*.

63.     In the paper, Mr. Plonski describes how crisis intervention programs might deal with "difficult callers," recommending that in his opinion hotline workers should be permitted to disengage from abusive callers once they identify a caller who has exploited the hotline for improper purposes, like sexual gratification. He explicitly wrote, "[i]t is the position of this presenter that such interactions should be ended as soon as identified."

64.     Mr. Plonksi further wrote, continuing to engage sex callers sets up unrealistic expectations for them that other people will be able to see beyond their behavior and show understanding. Ending the call, however, stresses to the caller that they need to take responsibility for their behavior, and for helping themselves. Additionally, ending the call immediately emphasized that the caller's behavior is not appropriate and that is abusive towards others.

65.     Ms. Ehrlich emailed a copy of the paper to management at RMCP, only to learn much to her surprise that the organization already had a copy, and supervisors knew of its contents but made no effort to implement its guidance.

66.     Notwithstanding the science, RMCP required Plaintiffs as a matter of policy and/or practice to remain on these calls no matter how offensive, denigrating, humiliating, or disturbing they became.

67.     Instead, RMCP warned Plaintiffs and their colleagues that they would be fired if they unilaterally made the choice to disconnect from a caller without first attempting to redirect and set boundaries, requesting backup from a lead, and obtaining permission to disengage.

68.     For Example, Supervisor Christensen coldly told Ms. Ehrlich, "We all have our personal triggers, and some people are not even bothered by these calls."

69.     Although RMCP provided Outlook, and Spark and Teams chat groups, to Plaintiffs and other staff, these chats were not safe spaces to discuss the harassment given all the pushback staff had received.

70.     Given the substantial pushback Plaintiffs and their colleagues faced attempting to name the harm they were suffering on Spark and Teams, and to find a safe space to discuss the pervasive sexual and racial harassment, Plaintiffs and eleven of their colleagues – all similarly situated Crisis Specialist working for RMCP – initiated an internal text-message group.

71.     The purpose of participating in the group text chat was to discuss work in a "safe space" without fear of reprimand or retaliation, to provide mutual aid and support, and to warn others of repeat abusive callers.

72.     On this group text chat, the Plaintiffs and their colleagues discussed the sexual and racist abuse, the lack of investigation or protections offered by management to them even though they had lodged complaints, RMCP's ineffectual policies and methods when abusive calls took place, and how each member of the chat could better support each other.

73.     For example, one series of messages found a Crisis Specialist who complained to a supervisor about a caller masturbating on her only to receive the trivializing response that the caller "just seems lonely."

74.     On August 23, 2023, after RMCP management, including the individually named officers – Mses. Marquez, Howe, and Littrell – found out about the text group, RMCP immediately sought to reprimand or terminate all who were involved.

75.     Each of the Plaintiffs – Mses. Ehrlich, Powers, McDonald, Miller, Montoya, and Battle – were terminated from their employment.

76.     The decision to terminate them was made and authorized at the highest levels of RMCP, by Mses. Marquez, who authorized the terminations, and Ms. Howe, who directly signed the termination letters, and Ms. Littrell who notified each of the Plaintiffs that she had engaged in an investigation and that they were terminated.

77.     As the Vice President of Human Resources, Ms. Howe is responsible for the Human Resources department and thus directly implicated as the highest person for Plaintiffs to communicate with about problems. The employee handbook states ""[i]f the concern is not properly addressed, employees…should contact RMCP Human Resources department."

78.     The RMCP employee handbook also states that RMCP's "CEO" will investigate any complaints of hostile work environment and discriminatory harassment.

79.     The RMCP policies and procedures manual further states that the CEO helps ensure quality compliance, and that the CEO may be involved in any investigations and meetings "of known occasions in which a caller has been involved in an adverse incident," otherwise known as "adverse incident reviews," including any meeting in which a "case review [is completed] in order to fully investigate each circumstance."

80.     No such investigations took place.

81.     Instead of the Vice President of Finance and Administration, which the employee handbook indicates is responsible for investigating and responding to claims of harassment alongside the CEO, Rocky Mountain Crisis Partners appears to have delegated that power to Ms. Littrell.

82.     Ms. Littrell was the Education Committee Chair for Defendant Rocky Mountain Crisis Partners.

83.     Instead, RMCP decided to investigate Plaintiffs because of their protected activities, and made no effort to investigate their complaints of harassment and discrimination.

84.     In fact, the investigation undertaken by Ms. Littrell did not investigate harassment, but turned the investigation on its head and scrutinized Plaintiffs instead, a far cry from what federal and state anti-discrimination laws require.

85.     The employee handbook further states that the CEO must be consulted before significant discipline is imposed. The employee handbook states "[u]pon approval from the CEO, an employee may be placed on Administrative Leave in a temporary capacity and for a reasonable time frame, removing them from a job assignment for reasons including but not limited to workplace and performance reviews or investigations."

86.     The employee handbook also states that "no representative of RMCP, other than the CEO, has the authority to enter into an agreement of employment for any specified person," and confirms and cements the ultimate control the CEO has over employment and operations at RMCP.

87.     Mses. Marquez, Howe, and Littrell, by virtue of their power in the pecking order at RMCP, their direct involvement in the decision to terminate Plaintiffs, and their immediate

role in formulating, determining, and controlling the policies and procedures at RMCP bear individual liability for the harms visited upon Plaintiffs.

88.     Several of the Plaintiffs contacted Ms. Marquez after their termination during which time she conceded that she was aware of their complaints of retaliation but would provide no further information.

89.     Ms. Marquez also told Plaintiffs she would revisit RMCP's policies and procedures, evidencing yet again her direct control and power over operations of the organization,  but did not rescind the terminations.

90.     Nor were changes to the applicable policies or procedures ever enacted to effectively protect Crisis Specialists from abuse by callers.

<u>**FIRST CLAIM FOR RELIEF**</u>
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e et seq.**
*Sexual Harassment and Hostile Work Environment*
**(Against Defendant RMCP)**

91.     Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

92.     Plaintiffs are all female – members of a protected class. They each speak in a female voice and tone and can easily be recognized as female by those engaged in conversation over the telephone.

93.     Between June and August of 2023, each of the Plaintiffs were subjected to daily and/or weekly phone calls from numerous callers (primarily male) who sought to misuse the line and to target female Crisis Specialists who answered the line, for their own personal sexual exploitation, as described above.

94.     Defendant RMCP was put on constructive and actual notice about repeated incidents of harassment by means of the known history of such calls/callers, RMCP's supervisory oversight and management's personal observations of such repeated calls, and by each of the Plaintiffs' and other RMCP employees' complaints about such calls.

95.     RMCP failed to take any reasonable remedial action to prevent this conduct from reoccurring.

96.     Instead, RMCP managers and supervisors told Plaintiffs or otherwise caused Plaintiffs to remain on such calls for prolonged periods of time during which the abuse continued.

97.     RMCP management criticized notes taken in Spark or COCO systems as "not caller centered" and erased evidence of abusive calls and callers.

98.     RMCP management action in removing notes in the call systems caused some such callers to be shielded from view and to repeat calls as if they were new or unrecognized callers without a history of abuse. This caused some Crisis Specialists to be caught off-guard when repeat callers would call again.

99.     The above-described unwelcome harassment created an intimidating, oppressive, hostile and offensive work environment that permitted sex grat callers to make contact and harass female Crisis Specialists without redress, to repeatedly call back and harass the same or additional Crisis Specialists without identification or effort to stop them, and to otherwise exploit Crisis Specialists who received calls and were not reasonably or timely permitted to disconnect from such calls.

100.     The pervasive conduct predictably recurred by means of unique callers and repeat

callers on a daily or weekly basis.

101.    The conduct was often times severe, as the calls included crude, offensive, and obscene content that was not welcome, and which caused Crisis Specialist to feel shame, embarrassment, and severe emotional exploitation and suffering as a result of being forced to take part.

102.    The calls also often described graphic and physical sex, harm, pain, torture, and abuse that could not reasonably be said to be an expected part of the job.

103.    The unlawful discriminatory practices complained of above were intentional.

104.    The calls interfered with each of the Plaintiffs' emotional and physical well-being in and outside of work, and each of the Plaintiffs were required to take time to seek counseling, support, and assistance to recover from such calls on a regular basis.

105.    As a direct and proximate result of the Defendant RMCP's intentional, reckless, and negligent conduct, Plaintiffs have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and were and are otherwise adversely affected because of Defendant RMCP's misconduct.

106.    Defendant RMCP acted with malice or reckless indifference to Plaintiffs' federally protected rights.

**SECOND CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e et seq.**
**Racial Harassment and Hostile Work Environment**
**(Against Defendant RMCP)**

107.    Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

108.     Plaintiffs Miller, McDonald, and Battle are all Black Americans – members of a protected class.

109.     Callers who sought to abuse the line to engage in racial harassment frequently lashed out at Black Crisis Specialists by using racially volatile language, including demeaning epithets, in a loud, aggressive, and harassing manner.

110.     Defendant RMCP was put on notice about the repeated incidents of rude, loud, aggressive, and offensive racist comments, through Crisis Specialist complaints, observation, and supervisor meetings.

111.     Defendant RMCP failed to take reasonable or timely remedial action to prevent this conduct from reoccurring.

112.     Instead, RMCP managers and supervisors told Plaintiffs Miller, McDonald, and Battle to remain on such calls for prolonged periods of time during which the abuse was allowed to continue.

113.     RMCP management criticized notes taken in Spark or COCO systems as "not caller centered" and erased evidence of abusive calls and callers.

114.     RMCP management action in removing notes in the call systems caused some such callers to be shielded from view and to repeat calls unrecognized.

115.     The above-described unwelcome harassment created an intimidating, oppressive, hostile and offensive work environment that permitted racially harassing callers to exploit and to harass Black Crisis Specialists without interference or redress, to repeatedly call back and harass the same or additional Crisis Specialists without identification or effort to stop them, and to otherwise exploit Crisis Specialists who received calls and were not permitted to disconnect

immediately from such calls.

116.    The unlawful discriminatory practices complained of above were intentional.

117.    These incidents interfered with Plaintiff Miller's, McDonald's, and Battle's emotional and physical well-being in and outside of work, caused severe emotional distress, and have required therapy in attempt to recover.

118.    As a direct and proximate result of the Defendant RMCP's intentional, reckless, and/or negligent conduct, Plaintiffs Miller, McDonald, and Battle have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and were and are otherwise adversely affected because of Defendant RMCP's misconduct.

119.    Defendant RMCP acted with malice or reckless indifference to Plaintiff Miller's, McDonald's, and Battle's federally protected rights.

### THIRD CLAIM FOR RELIEF
#### 42 U.S.C. § 1981
#### Racial Harassment and Hostile Work Environment
#### (Against all Defendants)

120.    Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

121.    Plaintiffs Miller, McDonald, and Battle are all Black Americans – members of a protected class.

122.    Callers who sought to abuse the line to engage in racial harassment frequently lashed out at Black Crisis Specialists by using racially volatile language, including demeaning epithets, in a loud, aggressive, and harassing manner.

123.    Defendant RMCP was put on notice about the repeated incidents of rude, loud,

aggressive, and offensive racist comments, through Crisis Specialist complaints, observation, and supervisor meetings.

124.    Defendant RMCP failed to take reasonable or timely remedial action to prevent this conduct from reoccurring.

125.    The central policy and decision-makers at RMCP were Mses. Marquez, Howe, and Littrell, including for compliance with EEO laws.

126.    Instead, RMCP managers and supervisors, including Mses. Marquez, Howe, and Littrell told Plaintiffs Miller, McDonald, and Battle to remain on such calls for prolonged periods of time during which the abuse was allowed to continue or enforced policies that required the same.

127.    RMCP management criticized notes taken in Spark or COCO systems as "not caller centered" and erased evidence of abusive calls and callers.

128.    RMCP management action in removing notes in the call systems caused some such callers to be shielded from view and to repeat calls unrecognized.

129.    The above-described unwelcome harassment created an intimidating, oppressive, hostile and offensive work environment that permitted racially harassing callers to exploit and to harass Black Crisis Specialists without interference or redress, to repeatedly call back and harass the same or additional Crisis Specialists without identification or effort to stop them, and to otherwise exploit Crisis Specialists who received calls and were not permitted to disconnect immediately from such calls.

130.    The unlawful discriminatory practices complained of above were intentional.

131.    These incidents interfered with Plaintiff Miller's, McDonald's, and Battle's

emotional and physical well-being in and outside of work, caused severe emotional distress, and have required therapy in attempt to recover.

132.     As a direct and proximate result of the Defendants' intentional, reckless, and/or negligent conduct, Plaintiffs Miller, McDonald, and Battle have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and were and are otherwise adversely affected because of Defendants' misconduct.

133.     Defendants acted with malice or reckless indifference to Plaintiff Miller's, McDonald's, and Battle's federally protected rights.

**FOURTH CLAIM FOR RELIEF**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2(a)**
**Retaliation**
**(Against Defendant RMCP)**

134.     Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

135.     Defendant RMCP engaged in unlawful employment practices in the State of Colorado in violation of Section 704 of Title VII, 42 U.S.C. § 2000e-2(a), by retaliating against Plaintiffs.

136.     Plaintiffs engaged in protected activity under § 704 of Title VII by opposing what they reasonably believed was an unlawful discriminatory employment practice based on sex and/or race.

137.     Plaintiffs opposed and resisted sexual and racial harassment by RMCP's clients.

138.     Plaintiffs often attempted to document the sexual and racial harassment for their coworkers and complained to supervisors and managers about the sexual and racial harassment.

139.     Plaintiffs and their coworkers communicated with each other about the harassment in the attempt to protect and support each other through internal text messages.

140.     Defendant RMCP terminated Plaintiffs for engaging in protected activities.

141.     The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees because they engaged in protected activity.

142.     The unlawful employment practices complained of in the foregoing paragraphs were intentional.

143.     As a direct and proximate result of the Defendant RMCP's intentional, reckless, and/or negligent conduct, Plaintiffs have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and were and are otherwise adversely affected because of Defendant RMCP's misconduct.

144.     The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiffs' federally protected rights, and Plaintiffs were aggrieved by the retaliatory practices.

## FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1981
### Retaliation
### (Against All Defendants)

145.     Plaintiffs hereby incorporate by reference, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

146.    Defendants engaged in unlawful employment practices in the State of Colorado in violation of 42 U.S.C. § 1981 by retaliating against Plaintiffs.

147.    Plaintiffs engaged in protected activity under Section 1981 by opposing what they reasonably believed was an unlawful discriminatory employment practice based on race and/or ethnicity.

148.    Plaintiffs opposed and resisted racial harassment by RMCP's clients.

149.    Plaintiffs often attempted to document the harassment for their coworkers and complained to supervisors and managers about the racist harassment.

150.    Plaintiffs and their coworkers communicated with each other about the racist harassment in the attempt to protect and support each other through internal text messages.

151.    Defendants terminated Plaintiffs for engaging in protected activities.

152.    The effect of the practices complained of in the forgoing paragraphs has been to deprive Plaintiffs of equal employment opportunities and otherwise adversely affect their status as employees because they engaged in protected activity.

153.    The unlawful employment practices complained of in the foregoing paragraphs were intentional.

154.    As a direct and proximate result of the Defendants' intentional, reckless, and/or negligent conduct, Plaintiffs have been deprived of equal employment opportunities, experienced emotional pain, suffering, inconvenience, loss of enjoyment of life, humiliation, and were and are otherwise adversely affected because of Defendants' misconduct.

155.    The unlawful employment practices complained of above were done with malice or with reckless indifference to Plaintiffs' federally protected rights, and Plaintiffs were

aggrieved by the retaliatory practices.

## SIXTH CLAIM FOR RELIEF
### Outrageous Conduct/Intentional Infliction of Emotional Distress
### (Against All Defendants)

156.    Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation contained in the preceding paragraphs of this Complaint.

157.    Defendant RMCP, in coordination and conjunction with Defendants Marquez, Howe, and Littrell intentionally and/or recklessly engaged in extreme and outrageous conduct by permitting sex gratification callers and racially abusive caller to harass each of the Plaintiffs, without taking reasonable or timely remedial action to protect them, by criticizing and condemning each of the Plaintiffs for communicating about the harassment, and by thereafter terminating each of the Plaintiffs for communicating about the harassment in an effort to protect themselves and each other from further abuse.

158.    Any reasonable member of the community, reflecting contemporary standards of decency, would find the Defendants' conduct atrocious, vile, going beyond all possible bounds of decency, and utterly intolerable in a civilized community.

159.    Defendants engaged in this conduct with knowledge of the scope and depth of the abuse, and with reckless knowledge that severe emotional distress would likely and did, in fact, occur, as several Plaintiffs suffered psychological issues, including PTSD and anxiety disorder, and others, and each continues to see a therapist in an effort to recover and return to their former selves.

160.    Defendants' conduct directly and proximately caused Plaintiffs' injuries, including severe emotional distress, loss of enjoyment of life, lost work opportunities, economic

harms, inconveniences, and dignitary injuries.

161.    Defendants are vicariously liable for the torts of their employees and/or agents when they are acting within the scope of their employment.

## SEVENTH CLAIM FOR RELIEF
**Wrongful and Retaliatory Discharge in Violation of Public Policy**
**(Against all Defendants)**

162.    Plaintiffs incorporate, by reference, all preceding paragraphs of this Complaint as if fully set forth herein.

163.    During their employment, Plaintiffs exercised their rights and duties to report and oppose suspected racial and sexual harassment, pursuant Title VII. As such, each of the Plaintiffs reported the abuse to their supervisors and thereafter continued to report, raise awareness of, and to oppose such harassment in subsequent communications between and amongst each other.

164.    Furthermore, during their employment, Plaintiffs' exercised their rights as workers to speak out about racial and sexual harassment between and among other similarly situated employees, for mutual aid and support, pursuant to the Section 7 of the NLRA (29 U.S.C. § 157) (guaranteeing employees the right "to engage in concerted activities for the purpose of…mutual aid or protection"), the Colorado Labor Peace Act (C.R.S. § 8-3-106 (providing for the right of employees to "engage in lawful concerted activities for the purpose of… mutual aid and protection"), and the federal Speak Out Act (42 U.S.C. § 19401, et. seq.) (protecting the freedom of sexual harassment victims to report and publicly disclose their abuse).[1]

_____

[1] The Speak Out Act states: "With respect to a sexual assault dispute or sexual harassment dispute, no nondisclosure clause or nondisparagement clause agreed to before the dispute arises shall be judicially enforceable in instances in which conduct is alleged to have violated Federal,

165.    Defendants Marquez, Howe, and Littrell acting for and on behalf RMCP, were aware or should have been aware, that Plaintiffs' conduct in reporting, opposing, or communicating about racial and sexual harassment, for the mutual aid and protection of themselves and other similarly-situated employees, was within the common law and statutory rights of Plaintiffs and was protected activity pursuant to the statutes identified above.

166.    Defendants Marquez, Howe, and Littrell, acting in their individual and official capacities for and on behalf of RMCP, took personal offense to Plaintiffs' criticisms regarding how RMCP's operations permitted racial and sexual harassment to occur. They each participated in the decision to discharge Plaintiffs from their employ and were motivated by malice in violation of Plaintiffs' rights and duties and against public policy. Each of the Defendants' acts, were in conscious and/or reckless disregard for the rights and privileges of Plaintiffs, were willful and wanton.

167.    Defendants Marquez, Howe, and Littrell each acted as agents for and on behalf of RMCP in the course and scope of their employment, in discharging Plaintiffs from their employ; their conduct is therefore imputed to Defendant RMCP via *respondeat superior*.

168.    As a result of the adverse employment action of Defendants, Plaintiffs suffered economic and non-economic damages including but not limited to emotional distress, lost wages, and lost benefits, economic hardship, pain and suffering, etc..

---

Tribal, or State law. PL 117-224, December 7, 2022, 136 Stat 2290. According to Rocky Crisis, its employment policies should be interpreted so strictly that any Crisis Specialist who **verbally** complains about harassment to a co-worker should be fired, because such communications about callers are "PHI," "not secure," and a "violation of HIPAA" and "confidentiality" policies.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment in her favor and against Defendants:

a.   All declaratory relief and injunctive relief, as appropriate;

b.   Actual economic damages, including but not limited to lost earnings and related medical expenses, as established at trial;

c.   Compensatory damages, including but not limited to those for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, medical bills, and other non-pecuniary losses;

d.   Punitive damages as provided for by law in an amount to be determined at trial.

e.   Exemplary damages as provided for by law in an amount to be determined at trial.

f.   Pre-judgment and post-judgment interest at the highest lawful rate;

g.   The maximum tax-offset permitted by law;

h.   Attorneys' fees and costs; and

i.   Such further relief as justice requires, and any other relief as allowed by law.

## JURY DEMAND

**PLAINTIFFS DEMAND TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted: August 13, 2024

RATHOD | MOHAMEDBHAI LLC

*/s/ Iris Halpern*
Iris Halpern
Crist Whitney
2701 Lawrence Street
Denver, CO 80205
Tel: (303) 578-4400
ih@rmlawyers.com
cw@rmlawyers.com

CIVIL RIGHTS LITIGATION GROUP

Raymond K. Bryant
1543 Champa St. #400
Denver, Colorado 80201
Tel: (720) 515-6165
raymond@rightslitigation.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2024, the foregoing First Amended Complaint was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

RATHOD | MOHAMEDBHAI LLC

*s/ Iris Halpern*
Iris Halpern

*Attorney For Plaintiffs*